**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 08-21571-CIV-SEITZ/O'SULLIVAN

AMANDA JESSUP

      Plaintiff,

v.

MIAMI-DADE COUNTY, et al.,

      Defendants.

_____/

## ORDER GRANTING DEFENDANTS VALDES', WAGNER'S AND CITY OF SOUTH MIAMI'S MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER is before the Court on the Motions For Summary Judgment filed by

Defendants Valdes [DE-94], Wagner [DE-96] and City of South Miami [DE-99]. Plaintiff

Amanda Jessup ("Jessup") asserts claims under 42 U.S.C. § 1983 and various state law causes of

action against the City of South Miami ("South Miami"), Miami-Dade County ("Miami-Dade")

and a number of their law enforcement employees. The action concerns a tragic outcome of the

series of events occurring over March 31, 2004 and April 1, 2004 in which Jessup was arrested

during an investigation of a mistaken report of theft and suffered a head injury resulting from a

psychotic episode while being detained in Miami-Dade County Jail. The Defendants involved in

Jessup's arrest for resisting an officer without violence now move for summary judgment on

Jessup's claims of false arrest, excessive force, battery and intentional infliction of emotional

distress.[1] Though the circumstances leading to Jessup's injury are unfortunate, the undisputed

record indicates that probable cause supported Jessup's arrest and that reasonable force was used

to effect that arrest. Accordingly, the Court finds as a matter of law that the Defendants did not

---

[1] Motions For Summary Judgment filed by Miami-Dade County and Corporal Katrina Robinson will be addressed in a separate order.

violate Jessup's constitutional rights in effecting her arrest for non-violent interference and are not liable on the related state law claims. The Defendants' Motions For Summary Judgment will be granted.[2]

## 1.    Background Facts

### A.    Response To Reported Theft

The following facts are either undisputed or described in a light most favorable to Plaintiff. The series of events leading to Jessup's arrest began on March 31, 2004, at approximately 2:30 a.m., when Scharlyn Delgado ("Delgado") saw a man playing with a basketball on her property at 5961 Southwest 79th Street in South Miami, Florida. (DE-92-1, Deposition of Scharlyn Delgado ("Delgado Dep.")[3] at 5:12-6:6; DE-92-2, Deposition of Maximilian Valdes ("Valdes Dep.")[4], Exhibit 2). Delgado called the police because she lived alone with two children and was frightened by the presence of a stranger. (Delgado Dep. at 6:7-12).

On the early morning of March 31, 2004, Jessup was at the home of her friend, Carl Casebeer ("Casebeer"). Casebeer resided at 5990 S.W. 79th Street, just down the street from Delgado, with his father and his stepbrother, Jeffrey Crockett ("Crockett"). (DE-111-2, Deposition of Jeffrey Crockett ("Crockett Dep.")[5] at 4:11-5:4). Jessup had been at Casebeer's

---

[2]  Valdes has also filed a Motion To Exceed Page Limit [DE-91] to have one extra page on his Motion For Summary Judgment, which Plaintiff does not oppose. That Motion will also be granted.

[3]  The Parties have filed multiple different excerpts from each deposition in this case under multiple docket entries. Excerpts from Delgado's deposition transcript were filed under DE-92-1, DE-98-8 and DE-102-6.

[4]  Excerpts from Valdes' deposition transcript were filed under DE-92-2, DE-98-3, DE-102-1, DE-110-1, DE-111-1 and DE-112-1.

[5]  Excerpts from Crockett's deposition transcript were filed under DE-92-7, DE-98-7, DE-102-5, DE-110-2, DE-111-2 and DE-112-2.

house for some time that night watching TV when Casebeer decided to go outside and started dribbling a basketball up and down the street.  (DE-92-5, February 24, 2009 Deposition of Amanda Jessup ("2/24/09 Jessup Dep.")[6] at 191:7-17).  Casebeer's basketball was the same brand as the one owned by Delgado, a fact which may have helped prompt Delgado's call to the police.  (DE-92-4, Deposition of Karl Casebeer ("Casebeer Dep.")[7] at 183:4-16).  Jessup went outside as well, and at some point Jessup and Casebeer began talking while standing behind a wooden gate in Casebeer's yard.  (2/24/09 Jessup Dep. at 194:12-18).

In response to Delgado's call, Officer Maximilian Valdes ("Valdes"), a uniform patrol officer for the City of South Miami, was dispatched to Delgado's residence.  (DE-92-2, Deposition of Maximilian Valdes ("Valdes Dep.") at 27:16-20, Exhibit 2).  The dispatch Valdes received was for theft of a basketball.  (Delgado Dep. 28:17-21, Exhibit 1).  When he had almost arrived at Delgado's residence, Valdes observed from his patrol car two persons, who turned out to be Jessup and Casebeer, moving inside the open wooden gate outside Casebeer's residence.  (Valdes Dep. at 29:18-30:16).  Casebeer's yard was unlit.  (Valdes Dep. at 31:1-6).

Because he was responding to a theft call and found the pair outside of a house in close proximity to the house that made the report, Valdes stopped his car and shouted to Jessup and Casebeer, "Let me see your hands, step out."  (Valdes Dep. at 31:14-17; Valdes Dep. at 40:10-17).  They stepped out of the yard and, after stepping out of his car, Valdes continued to give verbal commands for them to step forward with their hands up.  (Valdes Dep. at 31:7-15).

---

[6] Excerpts from Jessup's February 24, 2009 deposition transcript were filed under DE-92-5, DE-98-4, DE-102-2, DE-110-3, DE-111-3 and DE-112-3.

[7] Excerpts from Casebeer's deposition transcript were filed under DE-92-4, DE-98-6, DE-102-3, DE-110-5, DE-111-5 and DE-112-5.

Valdes then ordered them to the ground. (Valdes Dep. at 33: 6-12). When he did so, he had his gun out of its holster, pointed down, with his index finger on the slide of the gun instead of the trigger. (Valdes Dep. at 37:7-20). Valdes' alert level was "heightened" at the time because of the time of night, the fact that the yard was unlit and because he was encountering individuals he believed may have just committed a criminal act. (Valdes Dep. at 33:13-17; 35:9-24). He did not ask Jessup and Casebeer what they were doing before ordering them to the ground because he wanted to make sure the situation was safe before proceeding. (Valdes Dep. at 33:18-23).

Officer Darby Wagner was dispatched as a backup to Officer Valdes. (DE-98-1, Deposition of Darby Wagner ("Wagner Dep.")[8] at 22:6-10). Wagner initially proceeded directly to Delgado's residence to interview Delgado, but when he heard Officer Valdes shouting down the street, he rushed to Valdes' assistance. (Wagner Dep. at 29:21-25). When he arrived, Wagner saw a basketball on the grass next to Casebeer. (Wagner Dep. at 33:9-12). The officers then conducted a pat down for weapons after Valdes holstered his gun. (Valdes Dep. at 38:6-20). Jessup asked what was going on and wanted to know why the officers were detaining them. (Wagner Dep. at 32:18-21).

### B.   Investigation and Arrest

After officers found that neither Jessup nor Casebeer had a weapon, Valdes assisted them off the ground and then told Jessup to step away for a minute so that he could start conducting an interview. (Valdes Dep. 43:1-11). Jessup initially stepped away and Valdes began to interview

---

[8] Excerpts from Wagner's deposition transcript were filed under DE-92-3, DE-98-1, DE-98-2, DE-102-4, DE-111-6 and DE-112-6.

Casebeer. (Valdes Dep. at 43:12-44:14). Valdes asked Casebeer if he had stolen a basketball and Casebeer said he did not. (2/24/09 Jessup Dep. at 201:1-7). Jessup then stood next to Casebeer and told Valdes that Casebeer did not steal the ball. (2/24/09 Jessup Dep. at 201:8-21). According to Casebeer, Valdes' questioning became increasingly heated. Valdes repeatedly called Casebeer a liar and a thief, and used profanity while accusing Casebeer of having stolen the basketball. (Casebeer Dep. at 64:2-14).

At this point, Jessup became upset and Valdes instructed her to be quiet to prevent her from interfering with Valdes' investigation. Valdes asked Jessup four separate times to step away and allow Valdes to interview Casebeer, and Wagner also asked her to step away, but she continued to interrupt the interview and prevent Casebeer from answering questions. (Valdes Dep. at 44:17-25, 48:19-49:25, Exhibits 1 & 2; Wagner Dep. at 34:11-24; 38:10-25, 64:1-8). Valdes did not have perfect recall of what Jessup said during the altercation, but recalled that she used profanity and at some point said that what was going on was ridiculous. (Valdes Dep. at 47:18-48:18).

Crockett, Casebeer's stepbrother, started watching the altercation from inside the Casebeer residence after he noticed police car lights appearing outside. (Crockett Dep. at 22:8-17). After going outside to observe, Crockett briefly went inside to wake his stepfather because Valdes "seemed calm." (Crockett Dep. at 31:5-13). From inside the house, Crockett heard Jessup saying to Valdes "this is bullshit, this is nonsense" and "we hadn't done anything." (Crockett Dep. at 34:8-15). Crockett then went back outside and observed Jessup continuing to protest, noting that "she started getting louder at that point." (Crockett Dep. at 38:1-4). Crockett described Jessup as generally acting "loud and upset." (Crockett Dep. at 51:22-25).

Delgado also heard Jessup's exchange with the officers. She came over to the scene at some point and noticed that Jessup "kept antagonizing the officer" though Jessup was told a few times not to interfere. (Delgado Dep. at 9:21-10:2). Delgado heard an officer instruct Jessup not to get involved with the interview, but observed Jessup continuing to antagonize the interviewing officer in a "relentless" fashion. (Delgado Dep. at 18:6-19; 36:25).[9]

Valdes finally placed Jessup under arrest for non-violent resistence after she made a brief retort to a final request to step away and remain quiet. Crockett recalls that one of the officers officer gave Jessup a warning that she would be arrested if she continued to interrupt that she said, "go ahead and arrest me," or, "arrest me, I don't care." (Crockett Dep. at 43:1-9). Casebeer recalled that at some point Valdes said, "Shut up. Don't say another word or I'm going to put you under arrest." Casebeer testified that Jessup then "sighed and said 'ridiculous,' and Valdes then placed Jessup under arrest. (Casebeer Dep. at 68:13-25). Valdes testified that he arrested Jessup only after she had been instructed five times to remain quiet. (Valdes Dep. at 52:12-53:2).

After placing Jessup under arrest, Valdes took her to his patrol car and sat her inside with her hands cuffed behind her. (Valdes Dep. at 53:10-16.) Valdes then asked Jessup for her name, date of birth and other personal information, but she was not responsive. (Valdes Dep. at 56:1-17). Casebeer's father then came outside to speaks with the officers and Valdes agreed to release Jessup on a promise to appear if she gave her name and cooperated. (Casebeer Dep. at 81:7-24).

---

[9] Jessup's own recollection of the altercation was "fuzzy" from the point when Valdes first instructed her to be quiet, but she admitted that when the officers showed up she started "to go off a little bit,... wasn't paying attention to what was going on anymore." (2/24/09 Jessup Dep. at 198:16-25). She could not recall how she ended up in the back of Valdes' patrol car. (2/24/09 Jessup Dep. at 204:3-205:12). Casebeer could not recall Jessup's exact words during this altercation, but confirmed that she "started going off a little bit." (Casebeer Dep. at 147:6-19). He further testified that he did not believe Jessup "took [Valdes' instruction to remain quiet] seriously, what was going on in the whole situation." (Casebeer Dep. at 72:7-14).

Casebeer, his father and Valdes then tried for 15 to 30 minutes to get Jessup to provide her name without success.  (Casebeer Dep. at 87:1-5).  During that time, Jessup was praying in the back of Valdes' car because she thought she as going to hell and that Valdes was the devil.  (2/24/09 Jessup Dep. at 207:10-18; 216:25-217:11).  Jessup recalled Casebeer asking her to provide her name, but testified that she "couldn't talk."  (2/24/09 Jessup Dep. at 209:15-22).  At some point during the officers' investigation, Delgado came back to the scene with one of her sons, who brought his basketball, thereby proving that Casebeer was being truthful when telling the officers that he owned the basketball that was in Casebeer's possession when Valdes arrived.  (Crockett Dep. at 32:1-11; Casebeer Dep. at 67:2-68:6).

### C.  Transport To Metro Dade Headquarters

When Jessup did not provide her name and address to Valdes, he transported her in his car to the Turner Guilford Knight Correctional Center ("TGK"), the facility where City of South Miami officers transport arrestees.  (Valdes Dep. at 69:5-23).  On the way, Jessup maneuvered her hands under her legs and in front of her, then frightened Valdes when she opened the sliding glass door between the front and back seats to ask Valdes for his cell phone.  (Valdes Dep. at 71:9-19).  When Valdes arrived at TGK, a sergeant told him Jessup would not be accepted as a Jane Doe and that Valdes would have to take her to Miami Dade Police Headquarters to have her fingerprints taken and to obtain her name.  (Valdes Dep. at 70:4-10).

When Valdes arrived at Miami Dade Police Headquarters, he opened the rear door of his car and asked Jessup to step out.  (Valdes Dep. at 73:14-18).  Jessup did not respond and remained seated in the car, refusing to get out.  (Valdes Dep. at 73:24-74:4).  When Jessup did not respond to a second request, Valdes grabbed one of her legs to remove it from under the cage

7

enclosing the back seat when Jessup started kicking at Valdes. (Valdes Dep. at 74:9-21; 2/24/09 Jessup Dep. at 218:8-19).

Valdes then enlisted Officer Nobrega Sacramento to assist him in getting Jessup out of the car. (Valdes Dep. at 78:4-13). When the officers approached her, Jessup had her feet wedged underneath the cage and her arms wrapped around a seatbelt. (Valdes Dep. at 78:15-25). Sacramento tried to remove Jessup from the vehicle, but Jessup started kicking at Sacramento. (Valdes Dep. at 79:5-6). After Jessup continued resisting for another minute or two, Valdes told Sacramento that there was no way to get Jessup out of the car without hurting her other than to use pepper spray. (DE-92-9, Deposition of Ayme Sacramento ("Sacramento Dep" at 10:20-23). Valdes then sent one burst of pepper spray into the car and shut the door. (Valdes Dep. at 79:7-12). After observing Jessup for a few seconds, Jessup and Sacramento opened the door and attempted to remove Jessup from the car a second time. (Valdes Dep. at 81:6-21). Jessup resisted, but less forcefully, and the officers were able to remove her at that time without injuring her. (Valdes Dep. at 81:22-25).

The officers walked Jessup inside, then washed and dried her face. (Valdes Dep. at 82:14-22). After Jessup's prints were taken her identify was confirmed, Valdes put her back in his car and took Jessup to a holding cell at the South Miami Police Department headquarters. (Valdes Dep. at 83:23-84:22; 86:1-11).

On March 28, 2007, Jessup filed a thirteen-count complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida against Valdes, Wagner, South Miami and other Defendants. The complaint was properly removed on June 3, 2008. (DE-1). The current Third Amended Complaint ("Complaint") states the following claims that are relevant to

8

Defendants' Motions: (1) violation of 42 U.S.C. § 1983 for false arrest against Valdes and

Wagner in their individual capacities (Count III); (2) violation of 42 U.S.C. § 1983 for use of

excessive force against Valdes in his individual capacity (Count IV); (3) false arrest against City

of South Miami (Count V); (4) battery against Valdes (Count VII); and (5) intentional infliction

of emotional distress against Valdes (Count VIII). Valdes, Wagner and South Miami now move

for summary judgment on all of these claims.

### 2.    Summary Judgment Standard

Summary judgment under Fed. R. Civ. P. 56(c) is appropriate when "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986). The moving party bears the initial responsibility of showing the Court, by reference to

the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp.

v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be met by "showing" or "pointing out" to

the Court that there are no genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64

F.3d 590, 593 (11th Cir. 1995) (*per curiam*) (quoting *Celotex*, 447 U.S. at 325).

Even if the movant meets this initial burden, the non-moving party can still defeat

summary judgment by coming forth with "'specific facts showing that there is a genuine issue for

trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting

Fed. R. Civ. P. 56(e)); *see also Celotex*, 477 U.S. at 324. However, in so doing, the non-moving

party "must do more than simply show that there is some metaphysical doubt as to the material

facts." *Id.* at 586. A mere "scintilla" of evidence supporting the opposing party's position will

not suffice and there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Mendoza v. Borden, Inc.*, 195 F.2d 1238, 1244 (11th Cir. 1999).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). However, "[i]f the non-moving party fails to 'make a sufficient showing on an essential element of [its] case with respect to which [it] bears the burden of proof,' then the court must enter summary judgment for the moving party.'" *Id.* at 1181 (quoting *Celotex*, 477 U.S. at 323).

### 3.    Analysis

#### A.    False Arrest (Valdes and Wagner)

Count III of Plaintiff's Complaint claims that Valdes and Wagner violated § 1983 by detaining Jessup without reasonable suspicion of criminal activity, then arresting Jessup without probable cause for non-violent resistance of a police officer. The statute defining the crime of non-violent resistance, Fla. Stat. § 843.02, makes it unlawful to "resist, obstruct or oppose any officer ... in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." Accordingly, to determine whether the officers were undertaking "the lawful execution of [a] legal duty" during the altercation, the Court will first determine whether the officers had reasonable suspicion of criminal activity to detain Jessup and Casebeer. *See, e.g., Maldonado v. Florida*, 992 So. 2d 839, 843 (Fla. DCA 2d 2008) (defendant was not resisting against officers engaged in the lawful execution of their duties when the officers lacked reasonable suspicion to detain defendant); *C.H.C. v. Florida*, 988 So. 2d

1145, 1147 (Fla. DCA 2d 2008) (same). Then, if necessary, it will examine whether the officers had probable cause to arrest Jessup for resistance without violence.

a.    **Reasonable Suspicion For Investigatory Stop**

Under *Terry v. Ohio*, 392 U.S. 1 (1964) and its progeny, a police officer may detain a citizen and conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot. To have "reasonable suspicion," an officer conducting a stop must "have a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity." *United States v. Lindsay*, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)). 'Reasonable suspicion' must be more than 'an inchoate and unparticularized suspicion or hunch." *Terry v. Ohio*, 392 U.S. 1 (1968). "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity," even if such activity is "seemingly innocuous to the ordinary citizen." *United States v. Gordon.*, 231 F.3d 750, 754 (11th Cir. 2000); *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000).

In ascertaining whether a police officer had "a particularized and objective basis for suspecting legal wrongdoing," a court is to examine "the totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A police officer may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.*

11

Here, it is undisputed that Valdes and Wagner detained Jessup and Casebeer under the following circumstances: (1) the officers were responding to a call for police assistance due to the presence of a stranger on Delgado's property; (2) the dispatch to the officers was for theft; (3) it was 2:30 in the morning, when few if any other people were likely to be outside; and, (4) Valdes encountered Jessup and Casebeer in a yard just down the street from Delgado's house.[10] These undisputed facts establish Valdes and Wagner had a reasonable and articulable suspicion that Jessup and Casebeer had been or were in the process of committing a crime. *See, e.g., Lehman v. Hunter*, 2009 U.S. Dist. LEXIS 16790, *23 (M.D. Fla. Mar. 3, 2009) (officers had "more than a minimal level of objective justification" for stopping a vehicle to confirm or dispel that its occupant was involved in nearby criminal activity reported in a 911 call).  As a result, Valdes and Wagner lawfully detained Jessup and Casebeer, and were undertaking the lawful execution of their legal duties during the events that followed.[11]

### b.    Probable Cause For Arrest

Having found that Valdes and Wagner were lawfully executing their legal duties while detaining Jessup and Wagner, the Court must then determine whether Valdes had probable cause

---

[10]  Casebeer was also in possession of a basketball when Valdes detained him, but there is no evidence to indicate that Valdes saw the basketball when he asked Casebeer and Jessup to come out from behind the gate and get down on the ground.

[11]  The Parties have also briefed the issue of whether the officers' pat-down of Jessup and Casebeer for weapons was supported by a reasonable suspicion that they were armed.  Under Fourth Amendment jurisprudence, after an officer has "legitimately stopped an individual, the officer can frisk the individual so long as 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Hunter*, 291 F.3d 1302, 1306 (quoting *Terry*, 392 U.S. at 27); *see also, Bryan v. Spillman*, 217 Fed. Appx. 882, 885 (11th Cir. 2007) (officer had reason to be concerned for his safety when encountering subject in a poorly lit area who was wearing baggy clothes that could have concealed a weapon).  Given the time of night, Valdes' inability to clearly observe the subjects and his reasonable suspicion that the subjects had been or were engaging in criminal activity, Valdes' conduct was that of a reasonably prudent police officer and thus was permissible under the circumstances.

12

to arrest Jessup under Fla. Stat. § 843.02 for resisting, obstructing or opposing their investigation. While a warrantless arrest without probable cause serves as a basis for a § 1983 claim, "[t]he existence of probable cause at the time of arrest ... constitutes an absolute bar to a section 1983 action for false arrest." *Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004).

Probable cause to arrest exists when the arrest is objectively reasonable based on the totality of the circumstances. *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). "This standard is met when 'the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (quoting *Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995)). On summary judgment, a court must decide whether the Defendants have demonstrated as a matter of law that probable cause existed to arrest Jessup for non-violent resistance.

While a conviction for non-violent resistance ordinarily requires physical conduct to accompany offensive words, "[w]ords alone may result in obstruction of justice where the officer in question is 1) serving process; 2) legally detaining a person; or 3) asking for assistance." *Id. Francis v. Florida*, 736 So. 2d 97, 99 n.2 (Fla. 4th DCA 1999). As Valdes and Wagner legally detained Jessup and Casebeer to conduct an investigation, Jessup's words alone could have supported probable cause for an arrest.

Probable cause to make an arrest for non-violent resistance exists when the arrestee's verbal conduct is so disruptive it prevents an officer from executing a lawful duty during the detention of a suspect, such as conducting an investigation or effecting an arrest. *See Sullivan v. City of Pembroke Pines*, 161 Appx. 906, 909 (11th Cir. 2006); *Woods v. City of Plantation*, 2008

13

U.S. Dist. LEXIS 21572 (S.D. Fla. Mar. 19, 2008) (officer had probable cause to arrest partygoers who were verbally berating him while he attempted to effect an arrest). *Sullivan* is particularly instructive under the facts before the Court. In *Sullivan*, the plaintiff made a 911 call to request police assistance in subduing her daughter after her daughter jumped out of the family's minivan while it was moving. By the time the plaintiff relocated her daughter, the responding officer had arrived on the scene and was conducting an interview with plaintiff's daughter. The plaintiff approached the officer, who told plaintiff he was not ready to talk yet and told her twice to get back in the van. The plaintiff called 911 a second time and asked for another officer to be dispatched and continued to approach the responding officer. After the officer told her for the fourth time to get back in the van, he arrested the plaintiff for resisting without violence. The plaintiff was then acquitted of the charge following a jury trial.

However, the Eleventh Circuit Court of Appeals granted the officer summary judgment on Plaintiff's § 1983 claim for false arrest because it found as a matter of law that the officer had probable cause to make the arrest. The Court of Appeals emphasized that plaintiff was arrested "only after she repeatedly approached [the officer] and interfered with his investigation." *Id.* at 909. As a result, the officer had probable cause to believe the plaintiff was violating § 843.02 "because [plaintiff] obstructed his efforts to conduct his investigation of a suspected domestic disturbance ... by continuing to approach and interrupt him after she had been instructed to return to her vehicle." *Id.* at 909-910.

Here, there is no record evidence disputing that Jessup continued to interfere with Valdes' attempts to interview Casebeer despite the officers' repeated requests to remain quiet. The facts here are nearly identical to those in *Sullivan*, with the exception that the altercation was not

14

captured on tape. *See Sullivan v. City of Pembroke Pines*, 2005 U.S. Dist. LEXIS 46351, **5-6

(S.D. Fla. Apr. 14, 2005) (extensively quoting transcript of 911 call capturing plaintiff's dispute

with officer).  Though the passage of time and the perspectives of various participants give the

Court a somewhat less clear picture of what transpired than an audiotape's verbatim record, no

witness disputes that Jessup repeatedly interrupted Valdes' investigation.[12]  As a result, Valdes

and Wagner had probable cause to arrest Jessup for non-violent resistance[13] and they are entitled

to summary judgment on Jessup's § 1983 claim for false arrest (Count III).[14]

### B.    False Arrest (South Miami)

Jessup also raises a state law claim of false arrest against South Miami.  "The gravamen

of the tort of false arrest is the unlawful restraining of a person against that person's will." *City*

---

[12]  While Casebeer opined at his deposition that Jessup "was put under arrest [just] for saying ridiculous" (Casebeer Dep. at 68:10-24), his account is consistent with other witness' testimony that Jessup was arrested after making a brief response to one of Valdes' orders and does not dispute that she had already refused to comply with numerous other orders to stop interfering with the investigation.

[13]  While evidence that Jessup physically opposed Valdes is not ubiquitous like the evidence that she continued to interrupt him, Valdes testified that Jessup not only verbally interfered but stepped between Valdes and Casebeer and refused to step away from the interview when asked. (*See, e.g.,* Valdes Dep. at 44:12-22 ("Amanda Jessup came over and got in between me and Mr. Casebeer, got in between us."); Valdes Dep. Exhibit 2 ("Jessup was told 4 different times by me to step away so I can continue my investigation. Jessup refused to leave.")).  No witness has contradicted this account of the altercation and at least one witness' testimony supports it. (*See* Delgado Dep. at 10:5-14 ("I remember this person kept coming out arguing with this police officer and I know they did [say] more than once to go inside....").  Jessup's physical opposition and refusal to obey Valdes' orders to step away would also serve as probable cause for a non-violent resistance arrest. *See Francis v. State*, 736 So. 2d 97, 99 (Fla. DCA 4th 1999) (affirming conviction when defendant momentarily stood in front of officer's path and told him his assistance was not needed); *Wilkerson v. State*, 556 So. 2d 453, 455 (Fla. DCA 1st 1990) (arrest was constitutional when plaintiff repeatedly refused to adhere to officer's requests to leave area where officers were attempting to perform their legal duties).

[14]  Even if Valdes did not have reasonable suspicion to detain Jessup and Casebeer, and probable cause to arrest Jessup, he would still be entitled to qualified immunity against Jessup's false arrest claim because he did not violate clearly established law that would have put him on notice that he was violating Jessup's constitutional rights. *See Saucier v. Katz*, 533 U.S. 194, 201-202 (2001).  In this case, Valdes and Wagner are entitled to qualified immunity unless there is "a materially similar case that has already decided that what the police officer was doing was unlawful." *Durruthy v. Pastor*, 351 F.3d 1080, 1092 (11th Cir. 2003).  Plaintiff has not brought any such authority to the Court's attention.

*of St. Petersburg v. Austrino*, 898 So. 2d 955, 957 (Fla. DCA 2d 2005). A defendant to a claim of false arrest under Florida law can raise probable cause as an affirmative defense. *Rivers v. Dillards Dep't Store, Inc.*, 698 So. 2d 1328, 1331 (Fla. DCA 1st 1997).

As discussed above, the record evidence establishes as a matter of law that Officer Valdes had a founded and reasonable suspicion to detain Jessup and Casebeer[15], and probable cause to arrest Jessup for non-violent resistance of a police officer.[16] Accordingly, South Miami is entitled to summary judgment on Jessup's state law claim of false arrest (Count V).

### C.    Excessive Force

Count IV of Jessup's Complaint asserts a § 1983 claim against Valdes for using excessive force in violation of her rights under the Fourth Amendment. The right to be free from unreasonable searches and seizures also "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir.

---

[15] Florida has codified the *Terry* standard for initiating investigatory stops in its "Stop and Frisk Law," which provides that when an officer "encounters any person under circumstances which reasonably indicate that such person has committed, is committing, or is about to commit a violation of the criminal laws of this state or the criminal ordinances of any municipality or county, the officer may temporarily detain such person for the purpose of ascertaining the identity of the person temporarily detained and the circumstances surrounding the person's presence abroad which led the officer to believe that the person had committed, was committing, or was about to commit a criminal offense." Fla. Stat. § 901.151. *See, e.g., Johnson v. State*, 547 So. 2d 699, 702 (Fla. DCA 1st 1989) (stating that the "founded suspicion" standard is articulated in *Terry* and codified in § 901.151); *Bastien v. Florida*, 522 So. 2d 550, 551 (Fla. 5th DCA 1988) (citing both *Terry* and § 901.151 as the sources of a "founded suspicion" standard).

[16] As explained above, a police officer does not violate an individual's Fourth Amendment rights when conducting a pat-down for weapons when he reasonably believes his safety is in danger. *United States v. Hunter*, 291 F.3d 1302, 1306. While Florida's "Stop and Frisk Law" provides that an officer can search for weapons when he "has *probable cause* to believe that any person whom the officer has temporarily detained ... is armed with a dangerous weapon and therefore offers a threat to the safety of the officer or any other person," § 901.151 (emphasis added), the Florida Supreme Court has stated that "the Florida Stop and Frisk Law was not intended to, and does not, impose any higher standard than that of the Fourth Amendment." *State v. Dilyerd*, 467 So. 2d 301, 303 (Fla. 1985).

Moreover, Jessup had no weapons and her arrest did not follow from the pat-down. As a result, it is immaterial in this case whether Valdes had "probable cause," as the term is construed under the Florida Stop and Frisk law, to conduct a search for weapons.

2003). When determining whether an officer employs excessive force, a court is to analyze whether the "officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Factors to be considered in determining whether the force used was reasonable include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Lee v. Ferraro*, 284 F.3d 1188, 1094 (11th Cir. 2002). A court must also consider "(1) the need for the application of force, (2) the relationship between the need and amount of force used, (3) the extent of the injury inflicted." *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004).

In this case, the record indicates that the only notable physical force that Valdes employed in detaining Jessup and effecting her arrest was using pepper spray to remove her from his patrol car at Miami-Dade ID.[17] "Courts have consistently concluded that using pepper spray is reasonable ... where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002). Furthermore, the Eleventh Circuit Court of Appeals has stated that "pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee." *Id; see also, McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003) ("Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of

---

[17] Plaintiff asserts that Valdes' drawing of his weapon when commanding Jessup and Casebeer down to the ground was excessive, but officers can draw their weapons when approaching and holding individuals for an investigatory stop when it is reasonably necessary to protect an officer. *Courson v. McMillian*, 939 F.2d 1479, 1496 (11th Cir. 1991) (officer who pointed shotgun at suspects and ordered them to lie on the ground when he was alone at a vacant construction site when one of them became verbally abusive did not use unreasonable force). For the same reasons that Valdes properly initiated a pat-down for weapons, he also was acting reasonably under the totality of the circumstances when he approached Jessup and Casebeer with his weapon in the down and ready position.

handling a violent suspect who may cause further harm to himself or others.")[18]

The Court of Appeals' statements about pepper spray are especially significant here where the undisputed evidence shows that (1) Jessup was refusing to respond to a reasonable request to exit Valdes' patrol car, and (2) Valdes used pepper spray on Jessup as an alternative to engaging in a physical struggle with Jessup after she began kicking at him and another officer who were trying to remove her from his car.  While Jessup's offense was a misdemeanor, the application of pepper spray was reasonable under these circumstances where Jessup displayed physical aggression toward Valdes and refused to comply with his orders.  *See, e.g., Buckley v. Haddock*, 292 Fed. Appx. 791, 798 (11th Cir. 2008) (use of taser multiple times on non-violent, handcuffed arrestee was not excessive when arrestee refused to comply with reasonable orders and be placed in police car); *Benton v. Hopkins*, 190 Fed. Appx. 856, 859 (11th Cir. 2008) (use of pepper spray on arrestee swinging elbows and refusing to be handcuffed was reasonable); *Godman v. City of Largo*, 2009 U.S. Dist. LEXIS 48521 (M.D. Fla. Jun. 10, 2009) (use of pepper spray on DUI arrestee who resisted being placed in police vehicle was reasonable).  Valdes' use of pepper spray may very well have protected the safety of Jessup more effectively than had he attempted to physically remove her from the car while she continued to resist.  Having found as a matter of law that Valdes did not use excessive force to subdue Jessup, he is also entitled to summary judgment on Jessup's § 1983 for use of excessive force.[19]

---

[18] The facts in *Vinyard* are significantly different from the facts in this case.  The *Vinyard* court found that an officer was not entitled to qualified immunity when he pulled over to the side of a dark, secluded road to beat and pepper spray a female suspect charged with disorderly conduct and obstruction when she was handcuffed, secure in the back of a patrol car and not resisting.  However, *Vinyard*'s exegesis on the appropriate use of pepper spray is of sufficient breadth that the Court of Appeals' statements in that case are pertinent here.

[19] Valdes would be entitled to qualified immunity on Jessup's excessive force claim even if an issue of fact remained as to whether he violated her constitutional rights. "[W]hen applied in excessive force cases, qualified

### D.   Battery

Count VII of Jessup's Complaint asserts a state law claim of battery against Valdes. Florida law provides that "a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only if the force used is clearly excessive." *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. DCA 3rd 1996).  As a result, under Florida law, "contact incident to an arrest cannot form the basis of a claim for battery." *Epstein v. Toys-R-Us Delaware, Inc.*, 277 F. Supp. 2d 1266, 1275 (S.D. Fla. 2003); *see also Borges v. City of West Palm Beach*, 1994 U.S. Dist. LEXIS 10037, at *18 (S.D. Fla. Jun. 7, 1994); *Lester v. City of Tavares*, 603 So.2d 18 (Fla. 5th DCA 1992).  Having already found as a matter of law that Valdes' arresting of Jessup was lawful and that he did not use excessive force in effecting the arrest and when using pepper spray, he is also entitled to summary judgment on Jessup's battery claim.

### E.   Intentional Infliction of Emotional Distress

Finally, Jessup asserts a claim for intentional infliction of emotional distress against Valdes and Wagner (Count VIII).  In order for Jessup to establish a cause of action for the intentional infliction of emotional distress, she must show (1) the Defendants' conduct was intentional or reckless such that he knew or should have known that emotional distress would likely result, (2) the conduct was "outrageous," (3) the conduct caused emotional distress, and (4) the emotional distress was severe. *Clemente v. Horne*, 707 So.2d 865, 868 (Fla. 3rd DCA 1998).

---

immunity applies unless ... every reasonable officer [in the position of the defendant officer would] conclude the force was unlawful." *Nolin v. Isbell*, 207 F.3d 1253, 1255 (11th Cir. 2000).  Valdes' conduct did not rise to a level such that every reasonable officer in his position would have concluded his use of force was unlawful.  Furthermore, Plaintiff has not pointed to, and the Court is not aware of, any materially similar case that would have put Valdes on notice that he was violating Jessup's constitutional rights.

A defendant's conduct is "outrageous" only if it is "so outrageous in character, and so extreme in degree, as to beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278-79 (Fla. 1985). "The issue of whether or not the activities of the defendant rise to the level of being extreme and outrageous so as to permit a claim for intentional infliction of emotional distress is a legal question in the first instance for the court to decide as a matter of law." *Baker v. Florida Nat. Bank*, 559 So. 2d 284, 287 (Fla. Dist. Ct. App. 1990).

Having already found that the officers' stop and arrest of Jessup was lawful and that Valdes did not use excessive force in effecting the arrest and in removing Jessup from his police car, the Court also finds as a matter of law that the officers' conduct was not outrageous. While conduct involving the abuse of power by a police officer can certainly be considered extreme and outrageous, *see Bush v. City of Tallahassee*, 2007 U.S. Dist. LEXIS 74947, at *9 (N.D. Fla. Oct. 9, 2007); *Lashley v. Bowman*, 561 So. 2d 406, 409 (Fla. DCA 5th 1990) ("The Restatement, the commentators and this court all agree that outrageousness is more likely to be found where some relationship exists that gives the defendant actual or apparent authority over another or power to affect his interests."), the record indicates that Valdes did not abuse his power, but, under the totality of the circumstances, lawfully conducted an investigatory stop, made an arrest with probable cause, and effected the arrest with reasonable force. As a result, none of his conduct was "outrageous" and he is entitled to summary judgment on Jessup's claim of intentional infliction of emotional distress. Accordingly, it is hereby

ORDERED THAT

(1) Valdes' Motion To Exceed Page Limit [DE-91] is GRANTED.

(2) The Motions For Summary Judgment filed by Defendants Valdes [DE-94], Wagner [DE-96] and City of South Miami [DE-99] are GRANTED.

(3) An Order entering final judgment in favor of Valdes, Wagner and City of South Miami will be entered separately.

DONE AND ORDERED in Miami, Florida, this __10__ day of March, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record

21