**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NO. 08-21571-CIV-SEITZ/O'SULLIVAN

AMANDA JESSUP

Plaintiff,

v.

MIAMI-DADE COUNTY, et al.,

Defendants.
_____________________________________/

**ORDER GRANTING CORPORAL ROBINSON'S MOTION FOR SUMMARY JUDGMENT AND MIAMI-DADE COUNTY'S MOTION FOR SUMMARY JUDGMENT**

THIS MATTER is before the Court on Miami-Dade County's Motion For Summary Judgment [DE-122] and Corporal Robinson's Motion For Summary Judgment [DE-123]. Plaintiff Amanda Jessup ("Jessup") asserts claims under 42 U.S.C. § 1983 against Defendant Corporal Katrina Robinson ("Robinson") and Miami-Dade County ("Miami-Dade") as well as a claim for negligence against Miami-Dade. The action concerns a tragic outcome of the series of events occurring over March 31, 2004 and April 1, 2004 in which Jessup was arrested during an investigation of a mistaken report of theft and suffered a head injury during a psychotic episode while she was detained in the Miami-Dade Women's Detention Center. Robinson and Miami-Dade now move for summary judgment on Jessup's claims that Robinson was deliberately indifferent to her medical needs, that Miami-Dade was deliberately indifferent to her medical needs to failing to properly train its officers to respond to the needs of mentally ill detainees and that Miami-Dade was negligent in failing to provide Jessup with access to medical care. Taking the facts in a light most favorable to Plaintiff, the Court finds that Plaintiff has presented no admissible evidence showing that Robinson was deliberately indifferent to her medical needs.

Furthermore, Miami-Dade's Motion For Summary Judgment will be granted as Plaintiff has not provided evidence that Miami-Dade was deliberately indifferent to her medical needs or that Miami-Dade improperly denied Jessup access to medical care.

**1. Background Facts**

**a. Arrest and Placement in Women's Detention Center**

The following facts are undisputed, unless otherwise noted. In the early morning of March 31, 2004, City of South Miami police officers arrested Jessup for resisting a police officer with violence and resisting a police officer without violence. (DE-125-1, Offense Incident Report No. 04-2800).[1] At 9:07 a.m. that morning, Jessup was booked for these offenses at Turner Guilford Knight Correctional Center ("TGK"). (DE-125-2, Inmate Booking Information).

Later that morning, Jessup had an intake psychosocial assessment at TGK's Corrections Health Services Mental Health Unit. (*See* DE-125-4, Initial Psychosocial Assessment). The licensed clinical social worker who conducted the assessment, Daniel Wagner ("Wagner"), found that Jessup had stripped naked in her holding cell. (*Id.* at page 2). During the assessment, Jessup was not responsive to questions and was talking to herself. (*Id.*). Wagner also noted that Jessup appeared to be hallucinating. (*Id.*). This behavior led Wagner to order that Jessup "be placed

---

[1] As discussed in the Court's Order granting summary judgment to Defendants M. Valdes, Darby Wagner and City of South Miami [DE-166], Jessup was arrested outside the home of her friend Karl Casebeer ("Casebeer") during the early morning on March 31, 2004. The sequence of events leading to her arrest began when Scharlyn Delgado ("Delgado"), a neighbor of Casebeer's, called the police at around 2:30 in the morning to report the presence of a stranger on her property and theft of a basketball. The responding officers found Jessup and Casebeer standing outside with a basketball just down the street from Delgado's house and conducted an investigatory stop. The officers ultimately learned that the basketball belonged to Casebeer, but Jessup repeatedly interrupted Valdes while Valdes was attempting to interview Casebeer. After Jessup failed to heed numerous orders to remain quiet, Valdes placed Jessup under arrest for non-violent interference. Valdes was willing to release Jessup on a promise to appear if she provided her name, but she refused to do so. As a result, Valdes took her to Miami-Dade Police Headquarters to verify her identity. Jessup resisted Valdes again by kicking at him when he tried to remove her from his police car outside Miami-Dade Police Headquarters. (*See also* Offense Incident Report No. 04-2800).

(stripped) on suicide precaution" at the Women's Detention Center ("WDC") and that she see a psychiatrist. (*Id.* at page 3; DE-125-5, Medical Addendum Form). At 12:45 p.m., Jessup was transported from TGK to the 3rd Floor of the WDC and she was placed in a cell later that afternoon. (DE-125-8, 15 Minute/Hourly Confinement Physical Sight Checks; DE-125-13, Cell History).

The Third Floor of the WDC has three (3) wings: A-Wing, B-Wing and C-Wing. (DE-127-1, Declaration of Katrina Robinson ("Robinson Dec.") ¶ 8). At the time, C-Wing housed detainees that medical staff had diagnosed with psychological problems. (*Id.*). C-Wing had 2 units: 3-C1 and 3-C2. Between the two units was a supervisor's desk that had a vantage point into each unit. (*Id.*). Additionally, a desk was inside each unit, occupied by the officer assigned to that unit. (*Id.*). Each unit consisted of five cells that opened up into a communal day room. (*Id.*).

On April 1, 2004, inmates on suicide precaution were being housed in Unit 3-C1. (Robinson Dec. ¶ 9). Those inmates were continuously monitored by an officer whose desk was located inside the dayroom. (*Id.*). The officer assigned to suicidal inmates also documented the inmates' status every fifteen minutes on a form entitled, "15 Minute/Hourly Confinement Physical Sight Checks". (*Id.*). Inmates on suicide precaution were also observed hourly by medical staff. (Robinson Dec. ¶ 10).

Jessup was placed in Unit 3-C1, Cell #C1-371, which is the first cell on the left-hand side of the unit. (Robinson Dec. ¶ 12). Looking into the cell, the bed was on the left, a toilet was on the wall opposite the door and on the right-hand was a narrow ledge that was located about 2-3 feet off the floor. (*Id.*). The ledge was about six inches wide and ran for approximately six feet

along the wall. (5/5/09 Jessup Dep. at 141:5-18).

**b. April 1, 2004**

On April 1, 2004, Jessup was out to court from approximately 8:00 a.m. until about 1:00 p.m.. (DE-125-10, Nursing Evaluation Hourly Observation Form at page 3). At 1:00 p.m., during an observation by a nurse, Jessup was alert, but not responding to verbal questioning and was walking around in her cell naked. (Progress Record at page 1). Her menstrual period started that afternoon, but she refused the nurse's request to clean her up. (*Id.* at pages 1-2).

Corporal Katrina Robinson was the Third Floor Supervisor at the WDC between 3:00 p.m. and 11:00 p.m. that day . (Robinson Dec. ¶ 5). Robinson's responsibilities included supervising four correctional officers on that floor and relieving them when they went on break. (Robinson Dec. ¶ 6). During that same shift, Officer Regina Williams ("Williams") was assigned to monitor Unit 3-C1.[2] Williams' desk was located directly in front of and facing Jessup's cell, about 2 to 3 feet away. (Robinson Dec. ¶ 13). As was her usual practice, Robinson checked the status of inmates in Unit C1 throughout her shift. (Robinson Dec. ¶ 14).

At about 3:00 p.m., Robinson noticed Jessup standing on the ledge on the right-hand wall of her cell. (Robinson Dec. ¶ 15). Jessup then got on and off the ledge a number of times between 3:00 p.m. until about 3:45 p.m. without injury. (DE-15, 4/1/04 15 Minute/Hourly Confinement Physical Sight Checks; 5/5/09 Jessup Dep. at 143:2-17). Jessup testified that she was standing on the ledge to pray. (5/5/09 Jessup Dep. at 142:11-12). Robinson and Williams talked to her to get her to come down and Williams was ultimately successful in coaxing Jessup

[2] On July 8, 2009, the Court entered an Order dismissing Williams because Plaintiff did not sufficiently allege that Williams personally participated in, or exhibited deliberate indifference to, the deprivation of Jessup's constitutional rights [DE-88].

off the ledge permanently. (Robinson Dec. ¶ 15).

At other times in her shift, Robinson saw Jessup standing and praying in her cell. (Robinson Dec. ¶ 16) At one point, she also saw Jessup take toilet water in her hands and splash it on her herself. (*Id.*). Robinson asserts that at times Jessup was silent, but at other times she asked Robinson questions such as "Why am I here?" or "Can I make a phone call?" (Robinson Dec. ¶ 17).

At about 5:00 p.m., Officer Williams observed Jessup smearing her menstrual blood on the window of her cell. (4/1/04 15 Minute/Hourly Confinement Physical Sight Checks). According to Jessup, she put her blood on the window in the form of a cross and did not spell out any messages. (5/5/09 Jessup Dep. at 140:6-141:1).

At about 6:45 p.m., Robinson relieved Officer Williams for her break and began keeping the notations on Jessup's 15 Minute Site Checks. From about 6:45 p.m. until about 7:30 p.m., Robinson observed Jessup awake in her cell. (Robinson Dec. ¶ 19). Up until 7:30 p.m., no person had reported to Robinson that Jessup had previously threatened or tried to hurt herself. (Robinson Dec. ¶ 20). Robinson avers that, as of this time, none of the behaviors she observed indicated that there was an imminent risk or strong likelihood that Jessup would harm herself. (Robinson Dec. ¶ 17).

At around 7:30 p.m., just as Officer Williams was returning from her break, Jessup suddenly ran toward the wall of her cell and hit her head against it. (Robinson Dec. ¶ 21). At that moment, Robinson was at the officer's desk inside Unit 3C-1. (Robinson Dec. ¶ 22). Robinson told Officer Williams to report a medical emergency and immediately attempted to open the door of Jessup's cell with her key. (*Id.*). While Robinson had never had a problem with

the key to Jessup's cell in the past, she could not get the door to Jessup's cell open. (Robinson Dec. ¶¶ 24-25). Robinson also repeatedly told Jessup to stop hitting her head, but Jessup did not listen to Robinson's requests and continued to hit her head against the wall. (Robinson Dec. ¶¶ 22-23). No later than five minutes after Jessup began hurting herself, Robinson was able to open Jessup's cell door using a different set of keys . (Robinson Dec. ¶ 27).

Robinson and the officers responding to the emergency call then entered Jessup's cell restrained her. (Robinson Dec. ¶¶ 28-29). Jessup was then immediately taken to a medical clinic in a wheelchair. (Robinson Dec. ¶ 32). WDC staff called the City of Miami Fire Rescue at 7:36 p.m.. (DE-125-23, Incident Report of Lidia Leon). Fire Rescue staff observed that Jessup had a hematoma from hitting her head and a deformed nose. (DE-125-25, City of Miami Fire Rescue Report). At 7:45 p.m., Fire Rescue staff departed from WDC to take Jessup to Cedars Emergency Medical Center. (Incident Report of Lidia Leon). While the record does indicate what treatment Cedars Emergency Medical Center provided to Jessup, Defendants assert without objection from Plaintiff that Jessup was discharged from Cedars Hospital on April 15, 2004.

### c. Miami-Dade Officers' Training

At the time of the incident, Miami-Dade had in place two separate policies to provide for the safety of suicidal and mentally ill detainees. DSOP 12-003, titled, "Inmate Suicide Prevention and Response Plan," addresses guidelines used to determine whether suicidal precautions should be taken for an inmate and to deal with inmates who have been identified as suicidal. (DE-154-3, Miami-Dade Policy DSOP 12-003). DSOP 12-005, titled, "Recognizing and Supervising Mentally Ill Inmates," addresses guidelines for recognizing and supervising detainees with mental illnesses. (DE-154-4, Miami-Dade Policy DSOP 12-005). Corrections

employees working with mentally ill and suicidal inmates had a responsibility to read the polices and were required sign that they had received those policies. (DE-154-5, Deposition of Michael Urbistondo ("Urbistondo Dep.") at 43:12-45:7). Up until 2006, Miami-Dade did not provide corrections officers special training for working with mentally ill or suicidal inmates. (Urbistondo Dep. at 9:14-23). Instead, officers only had academy training on those subjects. (*Id.*).

Plaintiff has also discovered some facts about the prevalence of mentally ill and suicidal inmates in Miami-Dade's custody. She points to an Internal Affairs Unit memorandum from April 30, 2009 listing 16 inmates who had a history of mental illness before attempting to commit suicide. (DE-154-7, Attempted Suicides Memorandum). Miami-Dade's witness on correctional officer discipline testified that, prior to 2004, suicides did occur within the population of mentally ill inmates and disciplinary proceedings were instituted against officers following some of these suicides, but the witness never specified how many suicides occurred, how many disciplinary proceedings were instituted or the results of those disciplinary proceedings. (DE-154-6, Deposition of Tamara Key at 32:-12-25). Additionally, Plaintiff has produced no evidence that Miami-Dade's Board of County Commissioners or City Manager was aware of any of these facts prior to March 31, 2004.[3]

On March 28, 2007, Jessup filed a thirteen-count Complaint in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County against Robinson, Miami-Dade and

[3] The record does reflect that a Grand Jury Report was returned almost a year after this incident occurred that criticized Miami-Dade's handling of mentally ill inmates. (*See* DE-106-1). However, Plaintiff has produced no evidence to show that the Grand Jury Report, or any of the other documents or studies referred in or attached to her Third Amended Complaint were brought to the attention of the Board of County Commissioners or City Manager prior to March 31, 2004.

other Defendants. The complaint was properly removed on June 3, 2008 [DE-1]. The current Third Amended Complaint ("Complaint") presents the following claims that are relevant to Defendants' Motions: (1) violation of 42 U.S.C. § 1983 against Robinson for deliberate indifference to Jessup's serious medical needs (Count II), (2) violation of 42 U.S.C. § 1983 against Miami-Dade for failing to train or discipline its officers so as to be deliberately indifferent to Jessup's serious medical needs (Count VI), and (3) negligence against Miami-Dade for not providing Jessup with access to medical care. Robinson and Miami-Dade now move for summary judgment on all of these claims.

**2. Summary Judgment Standard**

Summary judgment under Fed. R. Civ. P. 56(c) is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact to be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden may be met by "showing" or "pointing out" to the Court that there are no genuine issues of material fact. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (*per curiam*) (quoting *Celotex*, 447 U.S. at 325).

Even if the movant meets this initial burden, the non-moving party can still defeat summary judgment by coming forth with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)); *see also Celotex*, 477 U.S. at 324. However, in so doing, the non-moving

party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. A mere "scintilla" of evidence supporting the opposing party's position will not suffice and there must be a sufficient showing that the jury could reasonably find for that party. *Anderson*, 477 U.S. at 252; *see also Mendoza v. Borden, Inc.*, 195 F.2d 1238, 1244 (11th Cir. 1999).

When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the non-moving party. *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001). However, "[i]f the non-moving party fails to 'make a sufficient showing on an essential element of [its] case with respect to which [it] bears the burden of proof,' then the court must enter summary judgment for the moving party.'" *Id.* at 1181 (quoting *Celotex*, 477 U.S. at 323).

**3. Analysis**

**a. § 1983 Claim Against Robinson**

Count II of Plaintiff's Complaint claims that Robinson violated § 1983 by acting with deliberate indifference to her serious medical needs. A jail official violates a pre-trial detainee's Fourteenth Amendment right to due process if she acts with deliberate indifference to that detainee's serious medical needs. *Crosby v. Monroe Cty.*, 394 F.3d 1328, 1335 (11th Cir. 2004). A detainee's right to receive attention to his serious medical needs encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries." *Cook v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1115 (quotation omitted); *see also, Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). However, to violate those rights, a jail official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 835, 837 (1994).[4] As a result, in order for Jessup to establish that Robinson has violated her right to medical care under the Fourteenth Amendment, she must present evidence that (1) she had a serious medical need, (2) Robinson was deliberately indifferent to that need and (3) her injury was caused by Robinson's deliberate indifference. *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007).

Here, Jessup claims that Robinson acted with deliberate indifference both by failing to place Jessup in restraints before Jessup began to run into her cell wall and by failing to respond to Jessup's self-harm as an emergency. To support her claim that Robinson acted with deliberate indifference, Jessup must present evidence that Robinson (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; (3) by conduct that is more than gross negligence. *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005); *see also Townsend v. Jefferson Cty.*, 582 F.3d 1252, 1258 (11th Cir. 2009). Under these elements, a court analyzing whether a defendant acted with deliberate indifference must typically assess a defendant's knowledge of the seriousness of the plaintiff's medical condition and her action, or inaction, in the face of such knowledge. *See, e.g., Lancaster v. Monroe Cty.*, 116 F.3d 1419,1426 (11th Cir 1997), *overruled on other grounds*, *LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009). While failure to respond to a known medical need can constitute deliberate indifference, *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989), in a case where the medical need results in self-injury, a

[4] While *Farmer* addresses the Eighth Amendment rights of a convicted prisoner, "the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner" and decisional law under both amendments apply to Jessup's claim. *Andujar v. Rodriguez*, 486 F.3d 1199, 1203 n.3 (11th Cir. 2007).

defendant is only liable when she deliberately disregards "a *strong likelihood* rather than a mere possibility that the self-infliction of harm will occur." *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (emphasis in original). The Court will address Jessup's two propsed grounds for deliberate indifference separately.

**1) Failure To Restrain Jessup Prior To Headbashing**

Jessup first claims that Robinson acted with deliberate indifference by failing to have Jessup put in four-point restraints after she stepped onto the ledge in her cell, drank from the toilet, and smeared blood on the window. However, Plaintiff has presented no evidence in support of her claim that any of these activities indicate a *strong likelihood* that she was about to do harm to herself through self-inflicted head trauma. In fact, the only record evidence on this issue, the testimony of two psychiatrists who treated Jessup at some point after this incident took place, indicates that putting Jessup in restraints, even after she drank from the toilet and began smearing her blood, would not have been appropriate. (*See* DE-125-17, Deposition of Dr. Mario Cuervo ("Cuervo Dep.") at 4:10-13; 94:5-25 (restraints are not appropriate response to drinking from toilet and smearing blood); DE-125-18, Deposition of Dr. Henry Storper ("Storper Dep.") at 4:21-5:7; 40:17-41:16 (restraints are only be used as "a last resort" and are not an appropriate response to behavior that is bizarre and not violent)). Both testified that use of four-point restraints is appropriate only when a patient "is violent, aggressive or out of control." (Storper Dep. at 40:13-16; Cuervo Dep. at 92:8-13). Though Jessup's activity was bizarre, it was not violent activity that presented an imminent risk that Jessup would start hurting herself.[5] *See*

---

[5] Jessup does not claim that she injured herself by drinking toilet water or smearing her blood. In her statement of facts [DE-153], Jessup cites testimony from Miami-Dade's witness on Miami-Dade's policies for recognizing and supervising mentally ill inmates that the smearing of blood presents a "biohazard issue." However,

*Townsend*, 582 F.3d at 1259-60 (deputies entitled to summary judgment when evidence did not exist to show that they were aware that detainees medical condition had become an emergency); *compare with Lancaster*, 116 F.3d at 1426-28 (jail officials not entitled to qualified immunity when evidence showed they were aware that detainee would start to have seizures and waited for them to start before obtaining medical treatment).

Moreover, even if Jessup had presented evidence tending to show an objective risk of self-injury existed before she ran into the wall of her cell, the undisputed record would still show that Robinson was not aware of such a risk. While a court can find that a defendant is subjectively aware of a risk "from the very fact that the risk was obvious," *Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996) (psychiatrist discontinued inmate's psychotropic medication without reviewing records that indicated inmate was a potential suicide risk), the risk of self-harm was not obvious as Jessup gave no indication that she had any intent on harming herself. *See Greffrey v. Alabama Dep't of Corr.*, 996 F. Supp. 1368, 1382 (N.D. Ala. 1998) (prison officials granted summary judgment for claim arising from inmate's suicide when evidence showed they were not aware of a previous suicide attempt or act of self-harm). Because a strong likelihood of self-harm did not exist and Robinson was not subjectively aware of such a risk, Robinson could not have been deliberately indifferent to Jessup's medical needs during the time leading up to Jessup's self-inflicted head trauma.

**2) Failure To Respond After Headbashing Began**

Jessup also argues that Robinson responded with deliberate indifference when Jessup

---

Jessup has neither alleged nor presented evidence to indicate that she ever suffered an injury from drinking toilet water or smearing blood. She also does not argue in her response that she suffered an injury that resulted directly from these activities.

began beating her head against the wall of her cell. When Jessup began running into the wall, a strong likelihood of self-harm arose and Robinson unquestionably became aware of that risk because she observed Jessup in the act.

Accordingly, the Court must assess whether Robinson disregarded the risk of self-harm in a fashion that was more than grossly negligent. Jessup only offers two documents to dispute the account provided of the officers' response that is presented in Robinson's declaration and supporting Miami-Dade records: (1) a declaration relating portions of a recorded statement given by Angela Price ("Price"), another inmate in Unit 3C-1, during a Miami-Dade internal affairs investigation; and, (2) a summary of Price's statement drafted by an officer involved in the investigation.[6] However, the affidavit consists entirely of the statements of an out-of-court declarant offering as true the statements of a second out-of-court declarant; in other words, it contains nothing but double hearsay.[7] Such evidence cannot be presented in admissible form at trial by having the affiant testify and, as a result, cannot be considered on summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (out-of-court statements made to an affiant must be admissible at trial in order to be considered on summary judgment). Additionally, while "factual findings" in internal affairs reports are generally admissible under an

---

[6] According to these documents, on May 7, 2004, Price stated that the following took place on April 1, 2004. At some point all of the officers left the surrounding area, and Jessup then repeatedly beat her head against the wall of her cell. (DE-154-2, Angela Price Statement Summary, at page 2). Because there were no officers in Unit 3-C1 or in the hallway outside, Price called out and stated, "Y'all she's banging her head." (*Id.*). Corporal Robinson yelled back to her, "She's just crazy." (*Id.*). Nurses only arrived to assist Jessup ten to twelve minutes after she called out to Robinson when they were making their rounds. (*Id.*). Jessup was bleeding out of her nose, mouth and right ear. (*Id.*). Price said that Corporal Robinson could not open the door to Jessup's cell with her own keys, but another officer came along and opened the door. (*Id.*).

[7] As a result, Defendants' Motion To Strike Plaintiff's Excerpts Of Sworn Statement Of Angela Price [DE-159] is granted.

exception to the hearsay rule, Fed. R. Evid. 803(8), summaries of interviews that are contained in those reports are also double hearsay that cannot be admitted at trial or considered on summary judgment. *See Roxbury-Smellie v. Fla. Dep't of Corr.*, 324 Fed. Appx. 783, 785 (11th Cir. 2009) (district court properly refused to consider on summary judgment the notes taken by an EEOC investigator summarizing interviews with plaintiff's co-workers); *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("placing otherwise inadmissible hearsay statement by third-parties into a government report does not make the statements admissible") (quotation omitted). Plaintiff has presented no evidence that the Court can consider that would establish Robinson acted with deliberate indifference.

The undisputed and admissible evidence shows that Robinson responded in a fashion that was not at all indifferent. Robinson immediately ordered Williams to request emergency assistance, told Jessup to stop harming herself and tried to open Jessup's cell. The only conduct that deserves the slightest scrutiny is Robinson's failure to open Jessup's cell with her key. If Robinson had been able to open Jessup's cell immediately, the extent of Jessup's injuries could have been minimized. However, there is no evidence to indicate that Robinson knew she could not open the door with the key in her possession. Because the record shows as a matter of law that Robinson was not deliberately indifferent to Jessup's medical needs, Robinson is entitled to summary judgment on Count II of the Complaint.

**b. § 1983 Claim Against Miami-Dade**

Count VI of Plaintiff's Complaint alleges that Miami-Dade also violated § 1983 by being deliberately indifferent to Jessup's right to treatment of serious medical needs through its failure to properly train its officers and supervisors to diagnose and treat inmates with mental health

issues.[8] To succeed on her § 1983 claim against Miami-Dade, Jessup must show that the County, and not just its employees, was deliberately indifferent to the possibility that Jessup would harm herself, since neither respondeat superior nor vicarious liability exists under § 1983. *See Cook*, 402 F.3d at 1115-16; *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue") (emphasis in original). Thus, only if a "policy or custom" of Miami-Dade County inflicted the injury can it be liable under § 1983. *City of Canton*, 489 U.S. at 385.

"A failure to adequately train municipal employees constitutes an actionable policy or custom for § 1983 purposes 'only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Cook*, 402 F.3d at 1116 (citing *City of Canton*, 489 U.S. at 388). "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

At this point, Jessup no longer has a viable claim that any of the officers that supervised her while she was at TGK or the Women's Detention Center violated her constitutional rights. However, even if she still could assert such a claim, Jessup has not presented any evidence that Miami-Dade was put on notice of a need to train its officers on the supervision of mentally ill or suicidal inmates, or that Miami-Dade subsequently made a deliberate choice not to take action. As discussed above, Plaintiff has not discovered any proof that Miami-Dade Board of

---

[8] Jessup's Complaint also alleges that Miami-Dade failed to properly discipline its officers with respect to their treatment of mentally ill and suicidal inmates, but does not attempt to sustain that allegation in response to Miami-Dade's Motion For Summary Judgment.

Commissioners, City Manager (or even the Director of its Department of Corrections) were notified as to any of the information about pre-2004 suicide attempts and self-inflicted injuries that Plaintiff presents in opposition to Miami-Dade's Motion For Summary Judgment. Moreover, Plaintiff has no evidence that any of these pre-2004 events involved violations of the inmates' constitutional rights. *See Gold*, 151 F.3d at 1351 (claim fails where plaintiff fails to present evidence of prior constitutional violations; *Popham v. City of Talledega*, 908 F.2d 1561, 1564 (11th Cir. 1990) (failure to prevent suicide does not, by itself, establish deliberate indifference). As Jessup has presented no proof that Miami-Dade was on notice at the time of the underlying events of a need to implement special training for its officers to identify and supervise mentally ill inmates, Miami-Dade is entitled to summary judgment on Count VI of the Complaint.

**c. Negligence Against Miami-Dade**

Finally, Count I of Plaintiff's Complaint alleges that Miami-Dade was negligent in failing to place Jessup in a medical facility instead of sending her to the Women's Detention Center and by failing to remove her from her cell to a medical facility once it was observed that she was exhibiting bizarre behavior. After dismissing previous iterations of this claim because of Plaintiff's failure to comply Florida's pre-suit notice requirements for medical negligence claims, the Court permitted Plaintiff to replead an ordinary negligence claim based on Miami-Dade's failure to provide access to medical services.

In Florida, "corrections officers have a duty to use reasonable care to insure the safety of inmates during their incarceration." *Ferguson v. Perry*, 593 So. 2d 273, 277 (Fla. DCA 5th 1992). This duty entails protecting inmates "against unreasonable risk of physical harm" as well

as providing first aid when an officer "knows or has reason to know that [an inmate is] ill or injured, and to care for them until they can be cared for by others." *Id.* (citing Section 314A of the Restatement (Second) of Torts). However, a prison official "will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick [person] over to a physician, or to those who will look after [the person] and see that medical assistance is obtained." *Nobles v. Corrections Corp. of Am.*, 327 Fed. Appx. 838, 840 (11th Cir. 2009) (quoting *Ferguson v. Perry*, 593 So. 2d 274, 277 n.5). A claim for negligently failing to provide access to health care "is decided on the access to and not the quality of care" provided. *Nobles v. Corrections Corp. of Am.*, 2008 U.S. Dist. LEXIS 56396, *3 (N.D. Fla. Jul. 23, 2008).

Here, Plaintiff has not presented evidence showing that WDC officials failed to use reasonable care in providing Jessup with access to medical care. The social worker at TGK, Daniel Wagner, not only placed Jessup in a unit where Jessup was to be observed constantly by officers and hourly by medical staff, he also arranged for her to see a psychiatrist. The testimony of the two psychiatrists who treated Jessup, which Plaintiff does not refute, indicates that the officers observing Jessup appropriately responded to her behavior.[9] As a result, Miami-Dade is also entitled to summary judgment on Count I of Plaintiff's Complaint. Having carefully considered, Defendants' Motions, it is hereby

ORDERED THAT

(1) Defendants' Motion To Strike [DE-159] is GRANTED.

---

[9] To the extent that registered nurses, clinical nurse specialists or advanced nurse practitioners were responsible for supervising Jessup and Plaintiff questions the exercise of their professional judgment in doing so, the claim would still be dismissed because such negligence claims against these kinds of nurses are subject to Florida's pre-suit notice requirement. *See Largie v. Gregorian*, 913 So. 2d 635 (Fla. DCA 3d 2005).

(2) The Motions For Summary Judgment filed by Defendants Robinson [DE-123] and Miami-Dade County [DE-122] are GRANTED.

(3) Final Judgment in favor of Robinson and Miami-Dade County will be entered separately.

(4) This case is CLOSED.

DONE AND ORDERED in Miami, Florida, this 18th day of March, 2010.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc: Counsel of Record